COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-228-CV
 
 
MARJORIE 
MADDOX STEGER,                                             APPELLANTS
WILLIAM 
L. (“BILL”) STEGER, JR.,
AND 
JOHN MARSHAL STEGER
 
V.
 
MUENSTER 
DRILLING COMPANY, INC.,                                    APPELLEES
DAVID 
KEITH MILLER, WAYNE PORTER,
CHRIS 
A. HESS, DOYLE E. HESS, FRANK
F. 
HESS, ANGELO B. NASCHE, AND RANDY
WIMMER 
AND WIFE, LINDA WIMMER
 
------------
 
FROM 
THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        In 
this will construction case, Marjorie Maddox Steger (Mrs. Steger) and her two 
sons, William L. (“Bill”) Steger, Jr. and John Marshal Steger (the Steger 
sons), appeal the trial court’s judgment that appellees 

 are the owners of the working interests in certain oil 
 and gas leases in Montague County, Texas. Because we conclude that the trial 
 court properly construed the will at issue with respect to Mrs. Steger’s 
 claims and that the Steger sons’ claims are barred by res judicata, we will 
 affirm the trial court’s judgment.
II. Background Facts and Procedural History
        The 
facts of this case are largely undisputed. Mrs. Steger is the last surviving 
child of John W. (J.W.) and Carrie T. Maddox, and the Steger sons are her only 
children. From the 1920s until his death in 1933, J.W. Maddox and his wife, 
Carrie T. Maddox, owned as their community property approximately 10,646 acres 
of ranch lands in Montague and Clay Counties, Texas. The Maddoxes’ property 
included the following lands in Montague County:
•334 
acres out of the John Chambliss Survey, A-123, subject to an undivided one-half 
mineral interest in 50 acres of this tract held by Aaron Cohen (Tract 1);
 
•All 
of the C.W. Thompson Survey, A-741, containing 480 acres, more or less, save and 
except 160 acres of land in the form of a square out of the northwest corner of 
the survey (Tract 2);
 
•All 
of the H.S. Arnold Survey, A-5, containing 320 acres, more or less, subject to 
an undivided one-half mineral interest in 100 acres of this tract, more or less, 
held by N.R. Beal (exclusive of the right to receive cash bonuses and delay 
rentals) (Tract 3);
 
•45 
acres, more or less, out of the S. Little Survey, A-417, and the W.P. Zuber 
Survey, A-887 (Tract 4).

        In 
the mid-1920s, the North Nocona Oil Field was discovered and extensively 
developed. The North Nocona Oil Field has been prolific and is still producing 
today. Tracts 1-3 of the Maddoxes’ land are in the middle of this oil field.
        During 
his lifetime, J.W. Maddox leased all of Tracts 1-3 and other lands for oil and 
gas purposes. He made, as lessor, at least twenty-six oil and gas leases 
covering various parts of these lands, all of which contained a fixed primary 
term of years or months and a secondary term of as long as oil or gas is 
produced in paying quantities. Carrie Maddox was also a lessor on most of these 
leases, and she had personal knowledge of their terms and provisions.
        In 
1931, J.W. Maddox hired an attorney to prepare his will. By that time, 
approximately 175 oil or gas wells had been drilled on the Maddoxes’ lands in 
the North Nocona Oil Field, including more than 150 producing wells. In 1931, 
the producing wells produced approximately 33,075 barrels of oil per month. The 
royalties J.W. and Carrie Maddox received in 1930 were between $2,460 and $4,920 
per month.
        When 
J.W. Maddox executed his will in July 1931, he was seventy-one years old, and 
Carrie was fifty-five. J.W. and Carrie had ten children, the youngest of 
whom—Marjorie (now Mrs. Steger) and Martha Lou—were sixteen and thirteen 
years old, respectively.
        J.W. 
Maddox died on May 26, 1933, and his will was admitted to probate in Montague 
County. Carrie served as the independent executrix of J.W.’s estate. Except 
for cash bequests that are not relevant to this case, J.W.’s will bequeathed 
to Carrie—as long as she remained unmarried—a life estate in all of his 
estate, i.e., his one-half interest in their community property (the J.W. Maddox 
community interest). In the fourth and sixth paragraphs of his will, J.W. gave 
Carrie the following powers and authority:
•the 
possession, management, control, and use of the residue of J.W.’s real and 
personal property during her life;
 
•full 
power and authority to manage, control, and lease for all purposes the real and 
personal property given during her lifetime;
 
•full 
power and authority to extract therefrom all oil, gas, and other minerals during 
her lifetime;
 
•power 
and authority to manage and control jointly with her estate all other property; 
and
 
•power 
and authority to collect and have the rents and revenues arising from the entire 
estate during her life. 



        J.W.’s 
will also bequeathed to each of his ten children a secondary life estate, 
following Carrie’s death, in specific parts of the J.W. Maddox community 
interest. To Martha Lou, he gave a secondary life estate in his community 
interest in Tracts 1-4 with a fee simple remainder interest to her bodily heirs, 
subject to a 3/4 royalty interest in favor of J.W.’s other nine children. If 
Martha Lou died without children, however, the fee simple interest passed to 
J.W.’s surviving children, share and share alike. Regarding Martha Lou’s 
life estate, in the eighth and nineteenth paragraphs of his will, J.W. gave her 
the following powers and authority:
•to 
collect rents and revenues;
•to 
make leases of whatever nature on the real estate;
•to 
extract therefrom all oil, gas, and/or other minerals over which she had control 
during her lifetime. 



        After 
J.W.’s death, Carrie, who remained unmarried, owned a life estate in the J.W. 
Maddox community interest in Tracts 1-4 and a fee estate in her one-half 
community property interest in these tracts. Also after J.W.’s death, Carrie 
leased various parts of Tracts 1-3 and other Maddox lands for oil and gas 
purposes. She made, as lessor, at least forty-two oil and gas leases, each of 
which—like J.W.’s leases—contained a fixed primary term of years or months 
and a secondary term of as long as oil or gas is produced in paying quantities. 
No other beneficiary under J.W.’s will joined Carrie as lessor or separately 
ratified these leases. However, no Maddox heir, including Mrs. Steger, ever 
questioned Carrie’s authority as life tenant to make oil and gas leases. 
Instead, Mrs. Steger and her brothers and sisters “just let it alone,” and 
“grabbed those checks and ran . . . because it was okay.”
        By 
1959, Martha Lou was married to Dan Hughes, Jr. In 1959, Carrie, as lessor, made 
two oil and gas leases, known as the J.W. Maddox No. 2 Lease and the J.W. Maddox 
No. 3 Lease, to Dan. The Maddox No. 2 Lease covered 50 acres out of Tract 1, and 
the Maddox No. 3 Lease covered 257 acres out of Tract 1, less the 50 acres in 
the Maddox No. 2 Lease. Both Leases were for a primary term of one year or more 
and a secondary term of as long thereafter as oil or gas was produced in paying 
quantities. Oil has been continuously produced in paying quantities from both 
Leases since 1959.
        Carrie 
Maddox died in January 1960. After Carrie’s death, no Maddox heir, including 
Martha Lou or Mrs. Steger, questioned the continuing validity of the Maddox No. 
2 and No. 3 Leases until Mrs. Steger commenced the underlying litigation in 
1996.
        In 
her will, Carrie devised to Martha Lou in fee simple all of Carrie’s undivided 
one-half community property interest in Tracts 1-4, subject to a devise of 9/10 
of all the production bonuses and oil and gas royalties that Carrie owned at the 
time of her death to Martha Lou’s siblings or their children. Carrie also 
devised to Martha Lou the exclusive right and power to execute oil and gas 
leases on Carrie’s interest in Tracts 1-4.
        In 
March 1977, Martha Lou, as lessor, made an oil and gas lease known as the J.W. 
Maddox No. 4 Lease to Dan Hughes, Jr. The Maddox No. 4 Lease covered 80 acres of 
land out of Tracts 2 and 3. None of J.W. Maddox’s will beneficiaries joined 
this Lease as lessor or separately ratified the Lease; however, they did not 
question Martha Lou’s authority, as life tenant under J.W.’s will, to make 
the Lease. The Lease’s primary term was for twenty years, and its secondary 
term was for as long thereafter as oil or gas was produced in paying quantities. 
Oil has been continuously produced in paying quantities from the Maddox No. 4 
Lease from October 1977 to the present.
        Dan 
Hughes, Jr. owned, operated, and produced the Maddox No. 2 and 3 Leases from 
1959, and the Maddox No. 4 Lease from 1977, until his death in May 1992. After 
his death, Dan’s will was admitted to probate in Dallas County, Texas. In his 
will, Dan bequeathed to Martha Lou his undivided one-half community property 
interest in the J.W. Maddox No. 2-4 Leases. Martha Lou served as independent 
executor of Dan’s estate until her death, at which time L. Durell Hughes began 
serving as independent executor.
        Martha 
Lou died in May 1993, and her will was admitted to probate in Dallas County. No 
child was ever born to or adopted by Martha Lou. L. Durell Hughes and Betty 
Wilkins served as independent co-executors of Martha Lou’s estate. In her 
will, Martha Lou directed that certain of her properties be sold and the 
proceeds used to pay her debts, expenses of estate administration, and federal 
and estate taxes, including “[a]ll oil interests that I own, except those oil 
interests that I inherited from my mother, Carrie T. Maddox, deceased.” Martha 
Lou bequeathed all of the oil, gas, and mineral interests that she had inherited 
from Carrie to the Steger sons.
        In 
September 1994, Muenster Drilling Company, Inc. purchased from the co-executors 
of Martha Lou’s estate the J.W. Maddox No. 2-4 Leases—which cover only 
acreage from Tracts 1-3—and all personal property and equipment associated 
therewith for $756,000. Since the September 1994 sale, Muenster Drilling has 
operated the Maddox No. 2-4 Leases and has continually produced and sold oil in 
paying quantities. Muenster Drilling and the other appellees did not purchase, 
have never owned, and do not claim an interest in any leases covering Tract 4.
        Following 
Martha Lou’s death, Mrs. Steger was the sole surviving child of J.W. Maddox 
and, therefore, was the sole remainderman under J.W.’s will to the J.W. Maddox 
community interest in Tracts 1-4. In May 1996, Mrs. Steger sued Muenster 
Drilling and David Keith Miller over the oil, gas, and mineral interests in 
Tracts 1-4 and the J.W. Maddox Leases. Appellees cross-claimed for declaratory 
relief and damages. In 1997, the Steger sons filed a separate suit against 
Muenster Drilling and Miller over the Maddox Leases, and the suits were 
consolidated by agreement in January 1998.
        In 
their suit, the Stegers sought to establish their ownership of an undivided 
mineral interest in Tracts 1-4 under the wills of J.W. Maddox and Martha Lou 
Maddox Hughes; 

 establish the invalidity of the Maddox No. 2-4 Leases; 
 and obtain an accounting, damages, and attorney’s fees from appellees. 
 Appellees raised various affirmative defenses to the Stegers’ claims and 
 sought attorney’s fees and a declaratory judgment that the J.W. Maddox No. 
 2-4 Leases are valid and that appellees 

 are the owners in fee simple of the Leases.
        The 
trial court eventually rendered a declaratory judgment for appellees 
 


 that (1) from September 1, 1994 forward, appellees had 
 owned the working interest 

 in the Maddox No. 2-4 Leases, as well as the personal 
 property and fixtures associated with the Leases; (2) the Stegers did not own 
 and had never owned the Leases or the accompanying personal property and 
 fixtures; and (3) the mineral interests that had reverted to Mrs. Steger as a 
 result of Martha Lou’s death and that the Steger sons had inherited under 
 Martha Lou’s will were subject to the Leases. The trial court also ruled the 
 Mrs. Steger was estopped from asserting her claims against appellees. The trial 
 court filed findings of fact and conclusions of law in Mrs. Steger’s suit. 
 This appeal followed.
III. Issues on Appeal
        In 
four issues, Mrs. Steger asserts that the trial court:
•misapplied 
the law governing will interpretation by erroneously concluding that J.W.’s 
will was both unambiguous and ambiguous;
 
•erred 
in interpreting J.W.’s will to authorize Carrie and Martha Lou, as life 
tenants, to execute oil and gas leases that extended beyond their lifetimes;
 
•erred 
in concluding that the Maddox No. 2-4 Leases did not terminate upon Dan Hughes, 
Jr.’s death under the doctrine of merger of estates; and
 
•erroneously 
concluded that Mrs. Steger’s claims were barred by estoppel.

        In 
two issues, the Steger sons assert that the trial court:
 
•improperly 
granted appellees’ motion for summary judgment because the doctrine of res 
judicata does not bar the Steger sons’ claims; and
 
•improperly 
denied the Steger sons’ motion for partial summary judgment because the J.W. 
Maddox No. 2-4 Leases terminated upon Dan Hughes, Jr.’s death under the 
doctrine of merger of estates.

IV. Res Judicata

        In 
their first issue, the Steger sons assert that the trial court improperly 
granted appellees summary judgment based on res judicata because this doctrine 
does not bar the Steger sons’ claims to all of the oil, gas, and other 
minerals contained in Carrie’s community interest in Tracts 1-3, which they 
inherited under Martha Lou’s will.
        Res 
judicata is the generic term for a group of related concepts concerning effects 
given final judgments. 

 Within this general doctrine, there are two principal 
 categories: (1) claim preclusion (also known as res judicata) and (2) issue 
 preclusion (also known as collateral estoppel). 

 Res judicata, or claim preclusion, prevents the 
 relitigation of claims that have been finally adjudicated or that arise out of 
 the same subject matter and therefore, with the exercise of reasonable 
 diligence, could have been litigated in the prior suit. 

 To determine what constitutes the subject matter of a 
 suit, courts examine the factual matters that formed the basis of the claim or 
 claims in the prior litigation, without regard to the form of the action. Any 
 cause of action that arises out of those same facts should, if practicable, be 
 litigated in the same lawsuit. 


        The 
policies behind res judicata reflect the need to bring all litigation to an end, 
prevent vexatious litigation, maintain stability of court decisions, promote 
judicial economy, and prevent double recovery. 

 Therefore, res judicata requires proof of the following 
 elements: (1) a prior final judgment on the merits by a court of competent 
 jurisdiction; (2) identity of parties or those in privity with them; and (3) a 
 second action based on the same claims as were raised or could have been raised 
 in the first action. 

 Parties can be in privity in at least three ways: (1) 
 they can control an action even if they are not parties to it; (2) their 
 interests can be represented by a party to the action; or (3) they can be 
 successors in interest, deriving their claims through a party to the prior 
 action. 


        In 
this case, after Martha Lou’s death, the Steger sons claimed they were the 
owners of the Maddox Leases under Martha Lou’s will and made demand upon the 
independent co-executors of her estate for possession of this property. In 
response, the co-executors of Martha Lou’s estate filed a declaratory judgment 
action in her probate proceeding. In their pleadings and motion for summary 
judgment in that case, the co-executors sought:
•a 
declaratory judgment that, under Martha Lou’s will, the Steger sons had (1) no 
ownership interest or claim of right in the working interest in the Maddox 
Leases or in the equipment associated with the Leases; and (2) no claim of 
right, title, or interest in Tracts 1-4 

 except for their ownership in the royalty interest that 
 Martha Lou received under Carrie’s will;
 
•a 
permanent injunction prohibiting the Steger sons from, in any way, interfering 
with the co-executors’ (1) operation of the oil and gas properties, (2) 
collection of the working interest share of the proceeds from production from 
Tracts 1-4, or (3) sale or attempted sale of Tracts 1-4, as required under 
Martha Lou’s will.

        In 
their pleadings and motion for summary judgment in the probate proceeding, the 
Steger sons denied the co-executors’ claims and counterclaimed for a 
declaration that
•the 
Maddox Leases on Tracts 1-4 had terminated at Dan’s death, based on the 
doctrine of merger of estates, and the mineral interest conveyed in the Leases 
had reverted back to Martha Lou;
 
•Under 
Carrie’s will, Martha Lou inherited the mineral interests that Carrie owned in 
Tracts 1-4;
 
•on 
the date of Martha Lou’s death, there was no working interest in existence 
with regard to the property that Martha Lou had inherited under Carrie’s will; 
and
 
•Martha 
Lou’s co-executors had no claim of right, title, or interest in the mineral 
interests in Tracts 1-4 that Martha Lou had inherited from Carrie.

        In 
March 1994, the probate court granted Martha Lou’s co-executors’ motion for 
summary judgment and denied the Steger sons’ motion. The probate court also 
ruled as follows:
[T]he 
Court hereby declares that under the Will of Martha Lou Hughes, Deceased, 
Defendants John Steger and Bill Steger have never had a claim of right, title or 
interest in and to the working interest in the oil and gas leasehold estates 
covering the four tracts in Montague County, Texas . . . and also in the 
proceeds from the sale of the working interest share of production, and also 
have no ownership interest or claim of right in the equipment located thereon or 
used in connection therewith.

                . 
. . .
 
IT 
IS FURTHER ORDERED that Defendants Bill Steger and John Steger are hereby 
permanently enjoined, restrained and prohibited from, in any way, interfering 
with the Co-Executors’ (i) operating the oil and gas properties on the Four 
Tracts; (ii) collecting or interfering with collection of the working 
interests’ shares of proceeds from the production from the Four Tracts; and 
(iii) attempting to sell and/or selling any of the Four Tracts in Montague 
County.

                . 
. . .

                All 
other relief not expressly granted herein is denied.

        The 
Steger sons appealed the probate court’s judgment to the Dallas Court of 
Appeals, which affirmed the probate court’s decision. 

 Thereafter, the Steger sons filed the underlying 
 lawsuit, in which they again sought a declaratory judgment that the Maddox 
 Leases had terminated upon Dan Hughes Jr.’s death and that they owned all of 
 the mineral interests in Tracts 1-3 that Carrie had owned. They also sought a 
 declaration that their mineral interests in Tracts 1-3 were not encumbered by 
 or subject to any valid oil and gas lease with appellees, and they sought an 
 accounting and damages from appellees as a result of appellees’ alleged 
 trespass, conversion, and wrongful extraction of oil, gas, and other minerals 
 under the Maddox No. 2-4 Leases. The Steger sons moved for summary judgment on 
 their claims. In response, appellees raised the affirmative defense of res 
 judicata 

 and moved for summary judgment on that defense, 
 asserting that the Steger sons’ claims were barred because they had 
 previously been litigated or could have been litigated to final judgment in 
 Martha Lou’s probate proceeding.
        We 
hold that the trial court properly granted appellees summary judgment on their 
res judicata defense because appellees established all elements of this defense 
as a matter of law. 

 The factual matters that form the basis of the Steger 
 sons’ claims in this case—whether the Maddox No. 2-4 Leases terminated at 
 Dan Hughes Jr.’s death and whether the Steger sons inherited under Martha 
 Lou’s will all of the mineral interests in Tracts 1-3 that Carrie had 
 owned—also formed the basis of their claims in Martha Lou’s probate 
 proceeding. Therefore, all of the claims that the Steger sons raised in this 
 case were raised or could have been raised in the probate proceeding. Further, 
 identity of parties is established. When appellees purchased the working 
 interests in the Maddox No. 2-4 Leases from Martha Lou’s estate, they became 
 Martha Lou’s successor in interest 

 to the Leases and are thus in privity with the 
 co-executors of her estate.
        Finally, 
the prior final judgment element is established by the probate court’s 
rendition of a final judgment on the merits of both the co-executors’ and the 
Steger sons’ claims, which the Dallas Court of Appeals affirmed. The Steger 
sons argue that the probate court’s summary judgment does not bar their 
current claims because the probate court and the Dallas Court of Appeals 
“[n]ever discussed or actually determined” some of the mineral interest 
ownership or merger of estates issues that the Steger sons raised in the probate 
proceeding. A summary judgment need not, however, discuss every ground relied 
upon for the trial court’s ruling. 

 Instead, when a summary judgment rests on more than one 
 ground or defense, the aggrieved party must assign error to each ground on 
 appeal, or the judgment will be affirmed on the ground about which no complaint 
 is made. 


        Here, 
the probate court’s summary judgment denied the Steger sons’ summary 
judgment motion and granted the co-executors’ motion without stating the 
grounds relied upon for these rulings. The probate court’s summary judgment 
also declared that, under Martha Lou’s will, the Steger sons had “never had 
a claim of right, title or interest” in the working interest in the Maddox 
Leases, the proceeds from production, or the equipment associated with the 
Leases. These rulings determined the Steger sons’ claims of mineral interest 
ownership and merger of estates against them with regard to the Leases. The 
Steger sons do not contend that the Dallas Court of Appeals failed to address 
any of their appellate challenges to the probate court’s summary judgment. 
Therefore, the probate court’s summary judgment is a final judgment on the 
merits of all the Steger sons’ claims. 


        The 
Steger sons also contend that the prior judgment was not rendered by a court of 
competent jurisdiction because the probate court would not have had jurisdiction 
over their trespass to try title and declaratory judgment claims after the 
Maddox Leases were purportedly sold to appellees in September 1994, i.e., after 
the Leases were no longer part of Martha Lou’s estate. This contention 
misstates the issue before us. For res judicata purposes, the only relevant 
inquiry is whether the prior final judgment was rendered by a court of 
competent jurisdiction. The Steger sons do not contend that the probate court 
lacked jurisdiction over their claims against the co-executors of Martha Lou’s 
estate. Indeed, they averred in the probate court proceeding:
This 
Court [the probate court] has jurisdiction over this matter and venue is proper 
here pursuant to Texas Probate Code, Sec. 5(E), as the dispute which is the 
subject [of] this [R]equest for Declaratory and Injunctive Relief involves a 
“matter incident to the Estate” of Martha Lou Hughes.

        Former 
section 5(e) of the probate code, which was in effect during the pendency of 
Martha Lou’s probate proceeding, provided: “All courts exercising original 
probate jurisdiction shall have the power to hear all matters incident to an 
estate.” 

 Further, probate code section 5A(b) provides:
In 
proceedings in the statutory probate courts, the phrases “appertaining to 
estates” and “incident to an estate” . . . include, but are not limited 
to, all claims by or against an estate, all actions for trial of title to 
land[,] . . . all actions for trial of the right of property, all actions to 
construe wills, . . . and generally all matters relating to the collection, 
settlement, partition, and distribution of estates of deceased persons. 
 



Clearly, 
the Steger sons’ claims against the co-executors of Martha Lou’s estate were 
“incident to an estate” and fell within the probate court’s jurisdiction; 
therefore, the probate court’s judgment was issued by a court of competent 
jurisdiction.
        Because 
appellees established all the elements of their res judicata defense as a matter 
of law, the trial court properly granted them summary judgment on the Steger 
sons’ claims based on this ground. We overrule the Steger sons’ first issue. 
 


 

V. Construction of J.W. Maddox’s Will
        In 
her second issue, Mrs. Steger contends that the trial court erred in construing 
J.W. Maddox’s will as authorizing Carrie and Martha Lou to execute oil and gas 
leases that extended beyond their lifetimes. 

 The cardinal rule for construing a will is that the 
 testator's intent must be ascertained by looking at the language and provisions 
 of the instrument as a whole, as set forth within its four corners. 
 

 The question is not what the testator intended to 
 write, but the meaning of the words he actually used. 

 Terms used are to be given their plain, ordinary, and 
 generally accepted meanings unless the instrument itself shows them to have 
 been used in a technical or different sense. 


        If 
possible, all parts of the will must be harmonized, and every sentence, clause, 
and word must be considered in ascertaining the testator’s intent. 
 

 We must presume that the testator placed nothing 
 meaningless or superfluous in the instrument. 

 Where practicable, a latter clause in a will must be 
 deemed to affirm, not to contradict, an earlier clause in the same will. 
 


        Whether 
a will is ambiguous is a question of law for the court. 

 A term is not ambiguous merely because of a simple lack 
 of clarity or because the parties proffer different interpretations of a term. 
 

 Rather, a will is ambiguous only when the application 
 of established rules of construction leave its terms susceptible to more than 
 one reasonable meaning. 

 If the court can give a certain or definite legal 
 meaning or interpretation to the words used, the will is unambiguous, and the 
 court should construe it as a matter of law. 


        Although 
a life tenant ordinarily cannot convey an estate that is greater than one tied 
to her life, 

 the instrument conveying the life estate can confer 
 greater powers upon the life tenant. 

 Thus, a testator or grantor can give the life tenant 
 power to execute oil and gas leases that extend beyond the life tenant’s own 
 lifetime. 

 Accordingly, we must decide whether the plain, ordinary 
 meaning of the terms used in J.W. Maddox’s will, as a whole, showed his 
 intention to give Carrie and Martha Lou the power to execute oil and gas leases 
 that extended beyond their respective lifetimes.
        Paragraph 
six of J.W.’s will gave Carrie “full[] power and authority” to “manage, 
control and lease” the J.W. Maddox community interest “for all purposes 
. . . during her life time and to extract therefrom all oil, gas and or other 
minerals.” [Emphasis supplied.] 

 The word “all” means “every,” and “purpose” 
 means “something set up as an object or end to be attained: INTENTION.” 
 


        Similarly, 
paragraphs eight and nineteen of J.W.’s will gave Martha Lou power, “during 
. . . her life time,” to “make leases of whatever nature” on Tracts 
1-3 “and to extract therefrom all oil, gas and/or other minerals . . . over 
which . . . she may have control.” [Emphasis supplied.] 

 “Whatever” means “of any kind at all.” 
 

 “Nature” means “a kind or class usu[ally] 
 distinguished by fundamental or essential characteristics.” 

 Construing these terms in accordance with their 
 ordinary meanings, we hold that J.W.’s will unambiguously authorized Carrie 
 to lease his half of the community for every end that she sought to attain, 
 including the end of making oil and gas leases that extended beyond her 
 lifetime, and gave Martha Lou the power to execute oil and gas leases of any 
 kind or class at all, including those that extended beyond her lifetime.
        In 
light of this unambiguous language, we decline to hold, as Mrs. Steger urges, 
that the time limits J.W. placed on Carrie’s exercise of the powers 
granted to her—her lifetime—limited the types of leases she could 
enter. Although Carrie was only authorized to extract oil and gas during her 
lifetime, her authority to lease for all purposes allowed her to enter into oil 
and gas leases that extended beyond her lifetime, even though she could not 
personally benefit from such leases after her death. Indeed, if a life tenant is 
granted the power to lease, but cannot bind future interests, “there is very 
little utility to the power because of the natural reluctance of any lessee to 
accept a lease which might be terminated by the death of the lessor.” 
 


        Further, 
paragraph nineteen of J.W.’s will expressly provided that the life estate in 
Tracts 1-3 bequeathed to Martha Lou was subject to a 3/4 oil royalty interest in 
favor of her siblings for as long as these tracts continued to produce oil in 
paying quantities after Carrie’s life estate. 

 This provision affirms J.W.’s grant of authority to 
 Carrie in paragraph six and further evidences his intent that she would enter 
 into oil and gas leases on his half of the community property that extended 
 beyond her lifetime.
        Mrs. 
Steger argues that the oil royalty bequest “merely deal[t] with the division 
of royalties arising from any extraction of oil or gas that might occur after 
Carrie[’s death]” and did not give any life tenant the power to execute oil 
and gas leases that extended beyond her lifetime. We disagree. The bequest only 
divided royalties on oil production from Tracts 1-3 that continued after 
Carrie’s death; thus, the bequest presumed that, at Carrie’s death, Tracts 
1-3 would be subject to leases that continued after her lifetime. Such leases 
would include both the still-producing leases that J.W. had entered and the 
still-producing leases that Carrie had entered; the will made no distinction 
between the two.
        Moreover, 
the construction of paragraph nineteen that Mrs. Steger urges would have 
defeated the entire bequest of the oil royalty to J.W.’s children—including 
Mrs. Steger and Martha Lou—in any leases that Carrie had entered on Tracts 1-3 
during her life tenancy because such leases would have terminated at Carrie’s 
death. Such a construction is unreasonable because it does not give full effect 
to J.W.’s expressed intention that his children would share the royalties on 
all of the oil production that continued on Tracts 1-3 after Carrie’s death. 
 


        Finally, 
the power to extract oil, gas, and other minerals—which J.W. expressly gave to 
both Carrie and Martha Lou—is a power to dispose of the corpus that ordinarily 
belongs to the remaindermen under a will rather than the life tenant. 
 

 Oil royalties are likewise part of the corpus and, as 
 such, are reserved for the remaindermen. 

 These powers of disposition can, however, be granted to 
 the life tenants by the testator, as they were in this case. 

 Courts will construe such provisions to give the 
 fullest effect to the testator’s intentions. 

 Construing all of these provisions in harmony with one 
 another, we hold, as a matter of law, that J.W.’s will unambiguously shows 
 his intention to give his wife and children, as life tenants, full power and 
 authority to dispose of all the oil and gas on the properties bequeathed to 
 them during their lifetimes if they so chose—including the power to execute 
 oil and gas leases that extended beyond their lifetimes. Accordingly, we hold 
 that the trial court’s conclusion of law is correct. We overrule Mrs. 
 Steger’s second issue. 


VI. Merger of Estates
        In 
her third issue, Mrs. Steger contends that the trial court erred in concluding 
that the Maddox No. 2-4 Leases on Tracts 1-3 did not terminate at Dan Hughes, 
Jr.’s death under the doctrine of merger of estates and in making
the 
fact-findings that support this conclusion. 

 The Maddox No. 2-4 Leases were made by Carrie and 
 Martha Lou, respectively, as lessors, to Dan Hughes, Jr., as lessee. In his 
 will, Dan devised his community property interest in the Maddox No. 2-4 Leases 
 to Martha Lou. Mrs. Steger asserts that, after Dan’s death, the interest in 
 the Leases that Martha Lou inherited under Dan’s will merged with her other 
 interests in Tracts 1-3, namely the interests that she inherited from J.W. and 
 Carrie. Mrs. Steger argues that merger is presumed because the greater and 
 lesser mineral estates in Tracts 1-3 were united in Martha Lou after Dan’s 
 death and there is no competent evidence that Martha Lou did not intend for a 
 merger to occur.
        Merger 
of estates is the absorption of a lesser estate in land into the greater; 
 

 however, application of this doctrine is disfavored in 
 Texas. 

 For merger to occur, the following elements must be 
 present: (1) there must be a greater and lesser estate; (2) both estates must 
 unite in the same owner; (3) both estates must be owned in the same right; (4) 
 there must not be an intervening estate; (5) merger must not be contrary to the 
 intention of the owner of the two estates; and (6) merger must not be 
 disadvantageous to the owner of the two estates. 


        The 
issue of whether a merger of estates was intended is ordinarily a question of 
fact that is determined by considering the estate owner’s interest and all 
attending circumstances. 

 Equity will not, however, decree a merger of estates 
 when it would be disadvantageous to the person acquiring both interests. 
 

 Thus, if, “from all the circumstances, a merger would 
 be disastrous to the party holding both estates, then his intention that it 
 should not result will be presumed.” 

 Further, when the evidence shows that it was in the 
 interest of the owner of the estates that they remain separate, the law 
 presumes an intent corresponding with such an interest. 


        In 
this case, there is no evidence that Martha Lou intended the interest in the 
Maddox No. 2-4 Leases that she inherited from Dan to merge into her other 
estates in Tracts 1-3. To the contrary, Martha Lou’s will evidences her intent 
that a merger of estates not occur. Martha Lou’s will directed her executors 
to sell “[a]ll oil interests that I own, except those oil interests that I 
inherited from my mother, Carrie T. Maddox, deceased” and use the proceeds to 
pay her estate taxes, which, according to her federal and state estate tax 
returns, were approximately $441,000. The inventory, appraisement, and list of 
claims filed in Martha Lou’s estate shows that, if the Maddox No. 2-4 Leases 
were excluded, the proceeds from the sale of her oil properties would have been 
far too little to cover her estate taxes.
        In 
addition, Cooper Blankenship, Dan and Martha Lou’s estate planning attorney, 
testified that Martha Lou never evidenced any intent after Dan’s death that 
the interest in the leasehold estates she had inherited from Dan should merge 
into her other estates in Tracts 1-3. Blankenship testified that, to the 
contrary, Martha Lou continued to operate and produce all three of the Leases 
after Dan’s death, to receive all proceeds of production attributable to the 
leasehold estates, and to pay all operating and production expenses. 
Blankenship’s testimony, coupled with the directive in Martha Lou’s will, 
shows that Martha Lou did not intend for the interest in the Maddox Leases that 
she had inherited under Dan’s will to merge into her other estates in Tracts 
1-3. 


        Further, 
this same evidence shows that merger of the Maddox No. 2-4 Leases into Martha 
Lou’s other estates in Tracts 1-3 would have been disadvantageous to her: 
merger would have precluded her from paying her estate taxes with proceeds from 
the sale of her oil interests. In light of this uncontroverted evidence that a 
merger of estates would have been contrary to Martha Lou’s stated intentions 
in her will, and therefore disadvantageous to her, a presumption arose that no 
merger was intended. We therefore hold that the evidence supports the trial 
court’s fact-findings and conclusion that no merger occurred. We overrule Mrs. 
Steger’s third issue.
VII. Conclusion 
Having 
disposed of all the Stegers’ issues on appeal, we affirm the trial court’s 
judgment.
 
 
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
 
PANEL 
A:   CAYCE, C.J.; HOLMAN and GARDNER, JJ.
 
DELIVERED: 
December 11, 2003